Our final case of the day is Kiebala v. Boris. Mr. Culbertson. Good morning, Your Honors. May it please the Court, this case comes here based upon some various business dealings between the parties that went sour. In particular, Mr. Kiebala's complaint was based largely in part on the defendant's use of the Internet, the various websites on the Internet to air his grievances with regard to those business dealings. Mr. Kiebala brought a five, excuse me, count complaint. However, on appeal, we're focusing only on count three sounding in defamation. That count was originally dismissed, pardon me, the original complaint that count three was dismissed on the basis of Illinois' one-year statute of limitation as the last identifiable original posting from the defendant had been made exactly one year and one day before the complaint was filed. Why didn't he amend his libel claim? Well, he was a pro se litigant, and I think… Absolutely, but he did amend other claims, did he not? And yes, he did. He filed an amended complaint, and it did include count three. He, the defendant, filed a motion for sanctions on the basis that, in part, that that count three should not have been included because it had been dismissed as barred by the statute of limitations. He didn't use… Amending his other claims, I had thought that he pointed to a more recent web posting. Correct. It may have been on his intentional infliction of emotional distress claim. Correct. If I'm not mistaken. So he was definitely aware of that, the more recent posting, and he was aware of its relevance, at least as he saw it, toward one of the claims. But he didn't seek to amend his libel claim. That is correct, and that's actually part and parcel of one of our main arguments on appeal, is that as a pro se litigant, I think he may have very well been intimidated by the fact that a sanctions motion had been brought against him, much more so than a regular practitioner might. I think he just didn't recognize the fact that that would have resurrected his claim. And one of our arguments is that as a pro se litigant, that the district court should have recognized that and brought that either to his attention or have realized that, well, count three, probably, I'm sorry. In our cases, we know that pro se litigants get some degree of solicitude. Correct. What you're describing, though, is in essence a duty on the district judge to coach the pro se litigant about how to present his claims more effectively. I don't think we're going quite that far. I am mindful I do not expect the district court to become an advocate. I think I wrote that in our brief. That's not the expectation. But I think the realization at this point that here's fresh postings that he identified. Well, what you're describing is an adversarial frame of mind. That is, that the district judge is required to look at the complaint, to review the briefs on the motion to dismiss, and figure out how could this plaintiff save this case. I think under the circumstances as presented in this case, I believe that that would have been proper. It certainly would not have been improper. The judge has the discretion to do that. But imposing that as a duty on district judges with the sanction of reversal, if they fail to spot the winning theory that the plaintiff himself failed to spot, would be a pretty long step, at least beyond my understanding, of how we deal with pro se litigants. I would add beyond what the Supreme Court says, because the possibility that Judge Hamilton mentions was raised explicitly by the petitioner in a case called McNeil against the United States, and the justices unanimously rejected it. It's 508 U.S. 106, 1993. The justices said, and I quote, we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel. So I wonder whether your argument is consistent with McNeil. I am not familiar with that case other than what you just indicated. I don't know that I'm suggesting there's an absolute requirement, but I think under the circumstances, I think it was pretty clear. And this is one of the first things that popped out at me. I was not counsel. I mean, he was pro se. And one of the first things I realized when I looked at the record is I looked at that, the amended complaint, and the listing of all the additional postings that he had found, and the first thing that popped into my head is, well, that would have resurrected count three. That's one of the reasons we're focusing on count three as opposed to any of the other accounts. Some of them were clearly properly dismissed without question. But, again, I don't think it would have been improper for the judge to do so, to require him to do so under other circumstances I don't think makes a whole lot of sense. He certainly wouldn't ever ask for that sort of relief had somebody been represented by counsel. So I just think under the circumstances that that's something he probably should have done. The second aspect of our argument is that in dismissing count three, Judge Aspin applied the Illinois Uniform Single Publication Rule. Mr. Caballa's claim, sorry, I'm getting a little dry up here. Mr. Caballa, as set forth in the complaint, a posting that was clearly originally outside of the limitation period had been updated at exactly one year to the day before the original complaint was filed. And the result of that is it took a posting that had existed for such a period of time that it went so far down the list in terms of what somebody might find if they were doing an Internet search for Mr. Caballa is it came right back up to the top of the list. And that gets into the whole discussion as to search logic, I think they call it search engine optimization. It's sort of an emerging thing at this point. Could I ask you to, I've spent at least a little bit of time looking into Illinois law on this, the case law on the single publication rule. And one case that looked pretty similar to this was the founding church of Scientology against the American Medical Association where the relevant allegedly defamatory publication was in 1968, an article distributed by the AMA, and then reprints are sent out in 1975 and suit is filed within a year of the distribution of those reprints. Correct. Same content. Distribution is intentional. And the Illinois appellate court affirmed dismissal and said that that all fell within the single publication rule. Right. I know I've read that case. I'm familiar with it. Generally, I don't recall the specific reasoning behind that. I know that that particular opinion was cited in the Blair versus Nevada landing case, which Judge Aspin did rely on in dismissing count three. And that case, my understanding was that the determination, the same determination that Judge Aspin came to was that the republication was for the exact same purpose. In other words, so in the Blair case, it involved pictures taken of an employee who had then left the employment and then those pictures were used in all sorts of advertisement in various mediums and things like that. And they said, well, because they were all used for the same purpose, and that was to advertise, I believe it was a casino, that therefore it was one single publication. Why do you think Judge Aspin's wrong here? It's the exact same website. The complaint is the exact same text, correct, down to the character. Correct. And the website includes the original submission date. And then it just has this note that just has this statement, as you know, or this tag updated. Right. Why is Judge Aspin wrong? We think that it's akin to the example set forth in the Hukich. I don't know if that's the correct pronunciation, but it's out of this court from 2009, Hukich v. Aurora Loan Service, wherein the court gives an example that comes from the restatement of torts, and it relates to both an evening and a morning edition of a newspaper. And that example provides that those are actually two separate publications because they are specifically designed to reach different audiences, notwithstanding the fact that it's the exact same content, it's the exact same methodology of publishing it. And so we think that this, what happened here, is very akin to that. And it goes again, like I said, to the various search logic that's involved. When you have something that's posted on a website, or even more, a website itself, when you do a search, the more content that's on it, the more times it's been hit, the more times people have seen it, the closer up to the top, the more findable it is. After a period of time has elapsed, it goes down in the rankings, and it's not so easily identifiable. So we think that the conscious independent act of republication at this point was the updating, which brought it right back up to the front of the line so that anybody going there would be one of the very first things that they would see. Thank you, Your Honors. Thank you, Counsel. Mr. Dale. Good afternoon, Your Honors, Counsel. May it please the Court. My name is David Dale. I represent the appellee, Mr. Derek Boris, in this case, and today we're asking the Court to affirm the district court's decision to dismiss plaintiff's claim of libel. Your Honors heard that there are two distinct issues on appeal today. One is procedural in nature, and the other involves an issue of substantive law. As far as the procedural question is concerned, the question is whether the district court abused its discretion in denying the plaintiff the opportunity to amend his claim. And we think that the record before the Court right now demonstrates that not only did the plaintiff have the opportunity to amend his claim throughout this proceeding, he voluntarily waived it or otherwise abandoned it along the way. We think the district court's decision can be affirmed on this point alone. As the plaintiff mentioned, when he originally filed his complaint, he brought five claims against the defendant, two sounding in breach of contract, the libel claim at issue, and then a tortious interference and an IIED claim. Now, when all five of those claims were originally dismissed by the district court, plaintiff affirmatively asked and moved for reconsideration and also asked for leave to amend, but only as to two of those claims, tortious interference and IIED. He made no attempt to ask the Court to reconsider or for leave to amend his two breach claims as well as his libel claim. And, in fact, when he filed his amended complaint, he only introduced new allegations or facts supporting his claims for tortious interference and IIED. And there was the issue later on between the parties, both through the motion to dismiss briefing as well as the sanctions briefing, as to whether or not the plaintiff was affirmatively attempting to re-litigate his libel claim. And he stated in no uncertain terms he was not bringing new information in support of a libel claim. He was not attempting to re-litigate the libel claim. I appreciate the plaintiff's contention that a pro se plaintiff should be afforded some sort of leniency and that the district court should take that into consideration. I think that the record that's before the court shows that this is a very competent pro se plaintiff who understands procedural issues, who understands what he needs to do in order to ask for reconsideration or to ask for leave to amend. He understands exactly what needs to be done to preserve these issues if he indeed wants to litigate them. I think he's demonstrated through the record that he gave up on this claim, along with his two breach claims. So I do agree that, yes, a pro se plaintiff should be afforded some leniency, but I think he's been afforded that leniency, and the court can't then step in and recreate a claim for him when he's voluntarily and affirmatively given it up. And so far as the second issue, which discusses the application of the Illinois Uniform Single Publication Act, I think the court can look to its decision in Pippin and see that, first of all, the Uniform Single Publication Act does indeed apply to publications that take place on the Internet, like the ones we have here. I mean, every day we have plaintiffs and defendants arguing over claims that are placed online that appear on sites like Yelp or like Ripoff Report here. The Single Publication Act was created to ensure that authors, writers, people who are expressing their opinion aren't going to be subject to liability for their statements for the rest of their lives. There has to be a cutoff at some point. I think the Pippin. So how is this post updated? So the argument is that the post was somehow updated because, from what I understand from plaintiff's argument, is that the word update somehow appeared on the post or that a new date appeared on the post. But as your honors mentioned in plaintiff's argument, the content was exactly the same. So suppose he had added a very in front of crooked or dishonest, and we've got the identical message except for one adverb added. Wouldn't that avoid the single publication rule? I think, in fact, that might, because I think it turns on the question of a conscious and independent act to republish either new content or to make it available to a new audience. And neither of those instances happen here. If he were to go online and. . . How do we know that? I mean, how does something get updated on the Ripoff Report? Well, and that's the question is an update on Ripoff Report by its own terms and conditions can happen because the complainer himself or herself actually goes online and adds new content updating maybe a resolution of their complaint or further complaints or frustrations that they weren't getting the resolution they were looking for. But the post can even be updated when people comment on the post below it. The post in question has had comments below it from other people expressing displeasure or either siding on both sides actually siding on the one hand with the defendant and other people siding on behalf of the plaintiff. Now those certainly I wouldn't think would expose the original author to continued liability because they didn't do anything to cause that post to be updated. It was other people commenting on the posting. And certainly that wouldn't restart the statute. Right, we don't know that for sure. I think the plaintiff's point is or the plaintiff's invitation is give me all the benefit of the doubt and assign responsibility for that updating at least at this stage to the defendant. And why would it be error to do that? Well, because I think it requires a little more than just the allegations that were in there. The allegations specifically relating to this supposed update was based on information and belief and that's about it. There's no allegations in the complaint that specifically say that the defendant visited the website, took some affirmative action, created an update. It merely alleges that an inference is not crazy, is it, given what he did to amend his intentional infliction claim. Well, even if we give him the benefit of the doubt and we construe this that, yes, maybe the post was updated as we're considering what the definition of update means, we still have to look at it and say is there any new content? Has this been intended to reach a new audience? Otherwise, we're just looking at a newspaper that's been recirculated or an article that's been republished 10 years down the road where the content is exactly the same, sort of like the Scientology case that you referred to. Here there's no argument that the content is exactly the same. There has been no update to the content. As far as audience is concerned, this is occurring on the same website ripoff report where the original post first happened, so the audience is exactly the same. We disagree as to how the algorithms work with regard to what will push a posting up or down in search engines. I think it's not as simple as simply saying that. Do you think we should decide the case based on your and your opposing counsel's representations about how those things work, given that we have this on the pleadings? Absolutely not. I don't think we need to go there. Google treats them as trade secrets and won't tell you what trade secrets they're listing. I don't think we have to go there. I don't think we have to decide technically how a search engine works and how the algorithms work. I think all we need to look at is was the content altered in any fashion, and we know the answer, and was it intended to reach a new audience? Well, I mean, the audience of the same website four years apart, why isn't it reasonable to treat that as a different audience? Well, I think if you look at the nature of the website, which is set up to help consumers who have or to allow consumers who have beef or have an argument with a company that they've been working with, I think that is the same audience. It's everyone who uses this website and everyone who accesses the website to either read up on a company or to make their own complaint. The audience of the Internet, I think, is a pretty large audience. It's going to be hard, unlike a newspaper, to parse out, okay, this newspaper's circulation is limited only to this geographical area. It is the Internet we're talking about. The audience is going to be anyone who has wanted to visit the website and either learn about a company or make a complaint of their own. So in that regard, Your Honors, I think that even if we were to bypass the procedural problems here and go to the substantive law issue, I think the court has properly applied the single publication rule here. I've got to tell you, I think they're distinct issues, and I don't see anything the plaintiff did that waived his right to argue about single publication rule. The judge had rejected that claim, decided it, he was done with it. You're correct, Your Honor. But I think even viewing the two issues independently, if we look at that single publication rule, no one argues that there's no difference in the content, there's no difference in audiences. If we were to reverse course here and to just simply state that any time this complaint appears anywhere on the Internet in this form, it's now restarted the statute of limitation, then we're getting into a whole argument of web crawlers that go out and grab articles and repost them on websites, and we're going to get into dangerous territory of saying, well, potentially there is no statute of limitations for Internet postings. It could last forever. If there are no further questions, I'll cede the remainder of my time. Thank you, Your Honor. Thank you. Mr. Dale, anything further? Mr. Culbertson? I just have two very, very brief points. Number one, with regard to defendant's waiver argument, I think that that position here on appeal is a bit inconsistent with the position that they took in the district court, because I note that when Mr. Kibala, who was not in the original dismissal by Judge Askin given leave to file an amended count three, he did include it in his amended complaint nonetheless, and that was met with a motion for sanctions on the basis that count three had been dismissed with prejudice. In fact, in his subsequent opinion, the appendix attached to the brief at page 36, in the motion for sanctions section, Judge Askin recognized that Mr. Boris was in fact arguing that that had previously been dismissed with prejudice, and I don't believe that it's consistent to say that it was dismissed with prejudice and you abandoned that claim. So I think that's a little bit inconsistent. And aside from that, I would just very, very briefly say that I think it's absolutely correct to say that we really don't know that there was any significant or any actual difference between the original posting and the posting is updated. Thank you, Judge. The case is taken under advisement and the court will be in recess. Thank you.